# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL NO. 5:05CV264-H

| | |
|---|---|
| **CHRISTI M. WARD,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social** ) | |
| **Security Administration,** ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #18) and "Brief Supporting ..." (document #19), both filed April 10, 2006; and Defendant's "Motion For Summary Judgment" (document #20) and "Memorandum in Support of the Commissioner's Decision" (document #21), both filed May 30, 2006. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

On September 28, 2006, the Magistrate Judge to whom this case was previously assigned recused himself, and on December 11, 2006, this matter was reassigned to the undersigned, who having considered the written arguments, administrative record, and applicable authority, finds that the Defendant's decision to deny Plaintiff Supplemental Security Income benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

# I. PROCEDURAL HISTORY

On December 21, 1999, the Plaintiff filed an application for Supplemental Security Income benefits ("SSI"), alleging she was unable to work as of January 1, 1989 due to diabetes. The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on November 16, 2001. On May 31, 2002, the ALJ issued a decision denying the Plaintiff's claim. The Plaintiff subsequently filed a timely Request for Review of Hearing Decision. On October 16, 2002, the Appeals Council denied the Plaintiff's request for review, making the initial hearing decision the final decision of the Commissioner.

On September 19, 2002, the Plaintiff appealed to this Court, see Case File No. 5:02CV161-H, and on July 17, 2003, the undersigned entered a "Consent Order" remanding the case to the Commissioner for further development of the record concerning whether the Plaintiff could still perform a "significant number of ... jobs ... given her [residual functional capacity]." Document #17, Case File No. 5:02CV161-H.

On June 13, 2005, a second administrative hearing was conducted. On August 16, 2005, the ALJ issued a second decision, again denying Plaintiff's claim for benefits. This became the Commissioner's "final decision" after sixty days passed. See 20 C.F.R. 416.1484.

The Plaintiff filed this action on October 18, 2005, raising a single issue on appeal: whether the ALJ "erred in his evaluation of Plaintiff's subjective complaints." Plaintiff's "Motion for Summary Judgment" at 1 (document #18). Specifically, although the Plaintiff concedes that her diabetes is "controllable" with proper treatment, she alleges that the ALJ failed to consider properly the Plaintiff's testimony that she was required to check her blood sugar levels "numerous times per

day" and self-administer insulin. See "Brief Supporting ..." at 7 (document #19). The parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Relevant to the narrow issue raised on appeal, the Plaintiff testified that she was 28 years-old at the time of the second hearing, that she had completed the ninth grade and could read and write; that she was separated from her husband and lived with her three school-age children, the youngest of which was five years-old; and that she had prior work experience as a motel housekeeper, but had not worked since 1991.

The Plaintiff testified that three to four times per week, her blood sugar level would drop to the point that her "arms and ... legs just d[id]n't function right," requiring her to drink orange juice and rest for 45 minutes; that she administered insulin shots four times daily; and that she needed to rest 30 minutes after each shot. (Tr. 446-449). The Plaintiff admitted, however, that she was able to care for her three children, including driving them to and from school.

The ALJ presented a Vocational Expert ("VE") with the following hypothetical:

> She has a ninth grade education and really no relevant work experience. She was a housekeeper at a motel, about 14 years ago for a short period. Please assume that this particular individual has a condition or a combination of conditions which would singly or in combination prevent her from doing more than the level of light work ... certain other limitations such that she should be allowed to sit at least every 30 minutes ... should engage in no more than occasional bending or stooping ... should not be exposed to extremely cold temperatures or hazardous working conditions ... has moderate limitations ... to adapt to work place changes ... she retains the full mental ability to meet the basic mental demands of unskilled work activity. Now, with those limitations can you identify any unskilled light and/or sedentary jobs which [the Plaintiff] could perform?

(Tr. 460).

The VE testified that with these limitations, the Plaintiff could work as a laundry classifier,

locker room attendant, and battery inspector; and that 14,209 of these light, unskilled jobs were available in North Carolina.

On April 28, 2000, David H. Brown, M.D., a medical expert for North Carolina Disability Determination Services ("NCDDS"), completed a Physical Residual Functional Capacity Assessment, noting that the Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, could sit, stand, and/or walk for about 6 hours in an eight-hour workday, and had no limitations in pushing or pulling; but that she should avoid more than occasional climbing or exposure to workplace hazards. In reaching these conclusions, Dr. Brown noted that the Plaintiff's medical chart showed that her diabetes was controllable when the Plaintiff took her medication as prescribed and complied with her doctors' other treatment recommendations. Dr. John Thomas, M.D., also a NCDDS medical expert, reviewed and affirmed Dr. Brown's initial findings.

The parties have expressly adopted the ALJ's recitation of the Plaintiff's medical records. Moreover, the Court has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> Clinical notes of an endocrinologist, Dr. Sandra S. Werbel, dated May 20, 1997, and a follow-up letter dated June 2, 1997, showed that the claimant had a history of poorly controlled Type 1 diabetes mellitus, with blood sugars ranging from 65 to 400 (Ex. IF). The claimant reported headaches and blurred vision with hypoglycemia and heartburn with hyperglycemia. Fundoscopic examination was benign, and neurologic examination was normal, with intact sensation. She had no evidence of sores on her feet. Laboratory data was normal except for an elevated glysated hemoglobin, at 9.5 percent. Follow-up notes dated September 9,1997 showed that her diabetes was still under poor control, with fasting readings ranging from 200 to 300 and readings during the day from 47 to 200. Her glycated hemoglobin remained elevated at 9.8. Subsequent blood tests for glycated hemoglobin included a reading of 8.8 percent in December 1997 and 12.0 percent on March 17,1998.
>
> In a letter dated March 18, 1998, Dr. Werbel stated that the claimant continued to have

blood sugar readings from the mid 40's up to 382 (Ex. IF, p. 13). "With these wide swings in blood sugar readings, I think her ability to work is limited," Dr. Werbel stated. "Hopefully, as we continue to smooth this out, she will be able to work with restriction only to avoiding heavy machinery and in an environment that would allow her to continue to monitor her blood sugars."

Glycosylated hemoglobin levels dated September 1, 1998 and December 3, 1998 were 7.9 percent and 7.6 percent, respectively (Ex IF).

The claimant was admitted to the hospital for one day in October 1998 with a diagnosis of viral gastroenteritis (Ex. 2F). She was treated with Lomotil and Phenergan. Her blood sugars ranged from 55 to 316, but her discharge report indicated she had no symptoms with these fluctuations.

Clinical notes of Dr. Peter Heibach dated February 2, 1999 showed that she had been experiencing nausea, diarrhea and vomiting over the past several days and had had a few episodes of nausea since her October 1998 hospitalization. She was prescribed Propulsid and Phenergan.

Clinical notes dated November 9, 1999 showed that the claimant had recently delivered a child (Ex. 2F). Her blood sugars were doing well.

The claimant was evaluated on February 12, 2000 for symptoms of racing heart and inability to take a deep breath (Ex. 5F). An EKG was borderline abnormal. She had a TSH level of 0.045, below a normal range of 0.49 through 4.67. Her attending physician assessed rule out hypothyroidism (post partum). She was prescribed Synthroid in May 2000 for mild hypothyroidism (Ex. 5F, p. 3).

Clinical notes of Dr. Heibach dated May 3, 2000 showed that the claimant was doing well except that in the mornings her fasting blood sugars were often as high as 200 (Ex. 5F). They improved significantly during the day. She reported non-specific malaise and fatigue. Dr. Heibach adjusted her insulin regimen.

The claimant was hospitalized for five days in February 2001 for pneumonia and ketoacidosis (Ex. 7F). She was 28+ weeks pregnant. She was aggressively treated with antibiotics and sliding scale insulin and was markedly improved on discharge.

A state agency consultative psychiatrist, Dr. R. N. Ahsanuddin, examined the claimant cw January 5, 2002 (Ex. 9F). She had complaints of diabetes, numbness in the feet, dizziness, and shortness of breath. She said she was unable to work because "my sugar goes high and low due to stress of the job. I almost black out." She last worked in 1991 as a motel housekeeper. Her insulin regimen included insulin Lantis, 40 units every night; Humolog, 17 units in the morning and 12 to 17 units in the evening. She reported she had to check her blood sugars 6 to 8 times per day. She said she experiences numbness in the

fingers and toes on getting op in the morning. She reported a weight gain of 20 pounds over the past year and said she feels tired all the time. She completed the ninth grade, which she had to repeat. Her longest period of employment with one employer was for two months. She reported a history of chronic, moderately severe, pervasive anxiety and indicated she bites her nails constantly. She reported a history of panic attaches that were moderately severe requiring that she go to the emergency room for medication, and mild symptoms of agoraphobia. She reported depression on and off since the birth of her second child, lasting five to six months, concurrent with the death of a close friend. She reported symptoms of depressed mood, diminished interest or pleasure in activities, loss of energy, weight change, insomnia, feelings of worthlessness, and inability to concentrate. She reported going to a mental health center once for counseling but had no history of admission to a psychiatric hospital. She cooks twice a week and does some housework. Her husband and mother help with the chores. She does not go shopping; her mother does it for her. She does not visit friends but goes to see her parents on Sundays. She does not go to church. She used to enjoy reading but is unable to do it any longer because of her diabetes affecting her eyes and concentration. Her height was 64 inches, and she weighed 201 pounds. She showed no psychomotor agitation or slowing. She reported her mood as feeling sad and tired Affect was appropriate; it was stable and showed depression mixed with anxiety and was mildly constricted. Her capacity to relate to the examiner interpersonally seemed to be fair. She could recall 6 digits forward and 4 backward. She could recall three of four unrelated words after five minutes. Remote memory appeared to be intact. She appeared to be functioning intellectually in the low average range. Her personality showed mixed features. The psychiatrist assessed major depression, recurrent, non-psychotic; generalized anxiety disorder, moderately severe; moderately severe panic disorder with mild agoraphobia. He assessed a Global Assessment of Functioning scale score of 45, highest in past year, 45.

Dr. Ahsanuddin completed an assessment of the claimant's mental functional limitations dated January 5, 2002 (Ex. 9F, pp. 6-7). He stated that the claimant's diabetes requires frequent testing and adjustment of her insulin dose. Fluctuations in blood sugar levels result in confusion, poor judgment, fainting and black outs. He opined that she had slight limitations in her ability to carry out detailed instructions; make judgments on simple work related decisions; and interact appropriately with the public, supervisors and coworkers. She had moderate limitations in her ability to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. He indicated that her diabetes also limited her driving, which would affect her reliability and attendance.

Clinical notes of Dr. Heibach dated October 31, 2002 show that the claimant reported new symptoms of heart palpitations, breathing anxiety, panic episodes, labile emotions, crying, lack of interest and lack of pleasures (Ex. 10F). She indicated that she had experienced symptoms before her hypothyroidism was diagnosed. She also reported a history of postpartum depression with similar symptoms. She reported some financial stressors. Her HgbAlC was 6.7 percent, indicating that her diabetes was well-controlled.

Dr. Heibach prescribed Fluoxetine for depression and encouraged daily walking.

A hemoglobin A1C taken on February 13, 2004 was 7.6 percent (Ex. 10F).

Clinical notes from Watauga Internal Medicine dated February 13, 2004 show that the claimant complained of problems with depression since the previous October (Ex. 10F, p. 4). She complained that she was tired all the time but cannot sleep well at night. She was given a six-week supply of Lexapro and was referred to a mental health center. Follow-up notes dated June 7, 2004 snowed that the claimant had not gone to the mental health center after her referral but had left her husband. She took Lexapro for six weeks and said she was doing better than in February 2004. She was again prescribed Lexapro. Clinical notes of a treating endocrinologist, Dr. Sandra Werbel, dated March 19, 2002 showed that the claimant reported she was doing well on Glargine. She reported feeling "much more even" and said her blood sugar readings were less variable. She had been having some difficulties with weight loss and decreased energy. She noted that most of her blood sugar readings were within the target range. Laboratory data dated March 19, 2002 showed a normal HgbAlC of 5.6 percent. She had an elevated TSH at 12.540. Dr. Werbel adjusted the dosage of her thyroid medication.

In a letter dated July 3, 2003, a treating endocrinologist, Dr. Larry Cantley stated that an HgbAl test that day was 7.0 percent and her TSH was normal. A microalbumin test was also normal.

Clinical notes of Dr. Cantley dated December 13, 2004 showed that the claimant reported that she had left her husband in February 2004 and was under so much stress that she dropped from 180 to 190 pounds to 120 to 125 pounds over three to four months. She had taken Lexapro for a short time. She had not taken any blood sugar readings in several months due to financial reasons. She estimated that her blood sugars were running 200 to 300. He noted that she did not appear at all depressed. Her hemoglobin Ale was 9.5 percent, and TSH was 1.7.

A hemoglobin A1C test dated June 10, 2005 was high at 9.6 percent.

Mental health treatment notes dated July 9, 2004 show that the claimant underwent a mental health screening on that date for assessment for services. The claimant reported that she had lost a lot of weight beginning in October 2003 and left her husband in February 2004. She reported that she gets "nervous spells" in which she is sick to her stomach and feels like she cannot breath. She reported loss of energy, not sleeping well, and loss of interest in her normal activities. She reported persistent depressive symptoms over the past five years. She reported panic attacks in which she cannot breath, sweats and feels nervous, with no specific precipitating event. She was afraid of having additional attacks. She reported suicidal ideation in December 2003 but denied current suicidal or homicidal ideation. Mental status examination showed normal motor activity, excessive nervous speech, and normal mood/affect. She indicated she was preoccupied

7

with feeling "crazy or stupid." The examiner assessed major depression, recurrent; and panic disorder, rule out agoraphobia, and estimated her Global Assessment of Functioning scale score at 33, indicating serious impairment in mental and social functioning.

(Tr. 426-29.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evi-

dence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff suffered diabetes mellitus, depression, and anxiety, which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff's subjective complaints were not fully credible; that Plaintiff had no past relevant work; and that the Plaintiff had the residual functional capacity

---

[1]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

<mark>9</mark>

for light work,[2] further modified to provide for the option to sit every thirty minutes, with only occasional bending and stooping, and no exposure to extremely cold temperatures or hazardous working conditions.

After noting that Medical-Vocational Rule 202.17 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ then correctly shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform and that, therefore, she was not disabled.

On appeal, the Plaintiff maintains that the ALJ failed to properly consider her subjective complaints about her diabetes, that is, that she was required to regularly check her blood sugar level and take insulin, but does not contend or explain how those limitations, or her diabetes generally, rendered her disabled. See Plaintiff's "Motion for Summary Judgment" (document #18) and "Brief Supporting ..." (document #19). Moreover, the undersigned finds that there is substantial evidence supporting the ALJ's conclusions concerning the Plaintiff's diabetes-related limitations and his ultimate determination that the Plaintiff was not disabled.

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency medical experts determined that the Plaintiff had the

---

[2]"Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

residual functional capacity for medium work – that is, that she could lift and carry 25 pounds frequently and 50 pounds occasionally, could sit, stand, and/or walk for about 6 hours in an eight-hour workday, and had no limitations in pushing or pulling; but that she should avoid more than occasional climbing or exposure to workplace hazards.

The ALJ found the Plaintiff not disabled, however, based on a residual functional capacity for light work, further modified to provide for the option to sit every thirty minutes, with only occasional bending and stooping, and no exposure to extremely cold temperatures or hazardous working conditions. In other words, the ALJ concluded that the Plaintiff had a <u>lower</u> residual functional capacity than reviewing experts concluded was supported by the objective medical record, including making a significant allowance for the Plaintiff's need to rest during work due to her fluctuating blood sugar level.

As the Plaintiff concedes, the medical record is clear that her diabetes was properly controlled by regular blood sugar testing and insulin, when she complied with her treatment regime. For example, when motivated by pregnancy to regularly seek and follow treatment for an extended period of time, she was generally able to maintain good control of her blood sugars. <u>See</u> Tr. 189, 201. By comparison, Dr. Cantley's medical chart demonstrates that when Plaintiff failed to check and record her sugars regularly and follow carbohydrate counting techniques, her levels rose and became difficult to regulate. On July 3, 2003, Dr. Cantley attempted to address Plaintiff's need for carbohydrate counting, diet and nutrition skills by recommending she attend a diabetes class session; she had not had formal diabetes education since her teenage years. There is no evidence Plaintiff ever obtained the recommended instruction and she did not return to Dr. Cantley for 18 months.

During a previous, eight-month lapse in treatment, the Plaintiff had done well on a prescription for Glargine, and had felt "much more even" with less variable blood sugar readings. The ALJ was

entitled to treat this as evidence that Plaintiff's diabetic symptoms did not impose functional restrictions as severe as she alleged. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965). See also SSR 96-7p ("[claimant's] statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"); and 20 C.F.R. § 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work"). Accordingly, the ALJ reasonably concluded that Plaintiff's failure to regularly seek treatment and to follow the recommendations of her treating physicians undercut her testimony as to the severity of her diabetic symptoms.

The record is also clear that the Plaintiff engaged in significant daily life activities during the subject period, such as bathing and dressing herself, cooking, performing other housework, socializing with family, and caring for her three children, including driving them to and from school. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for evaluating a claimant's subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that

Plaintiff's testimony was <u>not</u> fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996), <u>citing</u> 20 C.F.R. § 416.929(b); <u>and</u> § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." <u>Id.</u> at 595, <u>citing</u> 20 C.F.R. § 416.929(c)(1); <u>and</u> § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

<u>Craig</u>, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's diabetes, depression and anxiety and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of her pain, and the extent to which it affects her ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." <u>Mickles</u>, 29 F.3d at 921, <u>citing</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain

was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, that is, to care for her children, to cook and do other housework, to drive, and to socialize, as well as the objective medical record discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). In short, where there was substantial evidence to support the ALJ's determination that the Plaintiff's subjective claims of the limitations caused by her diabetes were not fully credible, and where, in any event, the Plaintiff's uncontested residual functional capacity mandated a finding of not disabled, the ALJ's ultimate decision to deny the Plaintiff SSI benefits was supported by substantial evidence.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion For Summary Judgment" (document #18) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #20) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED.**

Signed: December 12, 2006

Carl Horn, III
United States Magistrate Judge